S96A1349. KEENAN et al. v. PLOUFFE et al.
(482 SE2d 253)

SEARS, Justice.

One of the many issues raised by this appeal is whether a state-employed physician who is alleged to have negligently performed surgery on a private-pay patient is immune from suit under the State Tort Claims Act. The trial court granted summary judgment to the appellee-physician, Dr. Leo Plouffe, based upon official immunity. We conclude that Dr. Plouffe is not immune from suit because he is sought to be held liable only for the exercise of his medical (as opposed to governmental) discretion in treating his patient, and because the purposes of official immunity, as set forth in OCGA § 50-21-21 (b), would not be furthered by extending immunity to this situation. We therefore reverse the trial court's grant of summary judgment. Because of this holding, we need not address the constitutional issues raised by the appellant, which issues placed jurisdiction of the appeal in this Court.

The appellant, Randy Keenan, is the husband of Mrs. Onei Gue' Keenan. She was a private-pay patient of Dr. Plouffe on February 23, 1994. That day, Dr. Plouffe performed a laser laparoscopy/hysteroscopy on Mrs. Keenan at the Medical College of Georgia Hospital. At the time of the surgery, Dr. Plouffe was a member of the faculty of the Medical College of Georgia (MCG), Department of Obstetrics and Gynecology. During the surgery, Dr. Plouffe used a laser device known as an Argon Beam Coagulator. The surgery resulted in significant and permanent brain damage to Ms. Keenan. Randy Keenan

subsequently brought suit against Dr. Plouffe, as well as the manufacturer and distributor of the Argon Beam Coagulator. Keenan's complaint, as well as the expert affidavit attached to it, alleged, among other things, that Dr. Plouffe was not certified to use this particular type of laser, and that he had used it in a negligent manner during the surgery, thereby causing Ms. Keenan's injuries.

In a deposition, Dr. Plouffe testified that the diagnosis and treatment of Ms. Keenan, including the use of the Argon Beam Coagulator during the surgery, was left to his sole discretion and was not controlled by policies of the Board of Regents. Moreover, Dr. Plouffe was a member of the Medical College of Georgia Physicians Practice Group, d/b/a Physicians Practice Group (PPG). The PPG is organized as a non-profit association under the laws of Georgia and exists as a cooperative organization under the policies of the Board of Regents. The bylaws of the PPG provide that its members will be faculty members of MCG who are licensed to practice medicine in Georgia, and that the PPG's purpose is to collect fees for professional services rendered by its member physicians. The PPG billed for Dr. Plouffe's services to Ms. Keenan, while MCG sent a separate bill directly to the patient for non-physician related expenses. The PPG also provides fringe benefits to, and purchases professional liability insurance for, its member physicians.

Dr. Plouffe moved for summary judgment, asserting that he was acting as a state employee at the time of the surgery, and that he thus was immune from suit under OCGA § 50-21-25. Keenan responded that the official immunity set forth in the Tort Claims Act should not apply to state-employed physicians and that to apply it to Dr. Plouffe violated Keenan's constitutional rights in various respects. In this regard, Keenan contended that Dr. Plouffe was acting in his role as a private physician when he injured Mrs. Keenan. The trial court agreed with Dr. Plouffe, finding that he was teaching a resident doctor at the time of Ms. Keenan's surgery, and ruling as a matter of law that he was entitled to immunity. The court also ruled against Keenan on all his constitutional claims. Keenan has filed this appeal.

1. Keenan first contends that the trial court erred in ruling that Dr. Plouffe was protected by the doctrine of official immunity under the Tort Claims Act. We agree.

Subsection (d) of Art. I, Sec. II, Par. IX of the Georgia Constitution provides as follows:

> (d) *Except as specifically provided by the General Assembly in a State Tort Claims Act,* all officers and employees of the state or its departments and agencies may be subject to suit and may be liable for injuries and damages caused by

the negligent performance of, or negligent failure to perform, their ministerial functions and may be liable for injuries and damages if they act with actual malice or with actual intent to cause injury in the performance of their official functions. Except as provided in this subparagraph, officers and employees of the state or its departments and agencies shall not be subject to suit or liability, and no judgment shall be entered against them, for the performance or nonperformance of their official functions. The provisions of this subparagraph shall not be waived.

In accord with the emphasized language of subsection (d), the General Assembly enacted OCGA § 50-21-25 as part of the State Tort Claims Act. That Code section provides that a state employee is immune from suit for torts committed "while acting within the scope of his or her official duties or employment."

Thus, the decisive question in this case is whether Dr. Plouffe was acting within the scope of his official state duties while treating Ms. Keenan. If he was, then he is protected from suit by OCGA § 50-21-25. For the reasons explained below, we conclude that he was not acting in the course of his official duties as a state employee in his treatment of Ms. Keenan.[1]

2. First, although it could be argued that Dr. Plouffe was in the broadest sense acting within the scope of his employment because he had an obligation as a professor at the medical college to treat patients, he had distinct obligations to Ms. Keenan that were independent of his official state duties, and the duties he is alleged to have violated in this case relate solely to those independent obligations. Here, Ms. Keenan was a private-pay patient who employed Dr. Plouffe as her medical doctor. She was billed directly for his services by the PPG, and Dr. Plouffe stated that the diagnosis and treatment of Ms. Keenan, including the use of the Argon Beam Coagulator during the surgery, were left to his sole medical discretion, and were not controlled by the government. Therefore, significantly, the duties alleged to have been violated in this case relate strictly to the medical care provided to Ms. Keenan and do not call into play what might be termed "governmental considerations," such as the allocation of state resources for various types of medical care. Furthermore, Dr. Plouffe's primary duties in providing care to Ms. Keenan were to her and not to the State of Georgia.

---

[1] Whether under the relevant facts (which are not in dispute) Dr. Plouffe is entitled to official immunity is a question of law for the court. See *City of Valdosta v. Bellew*, 178 Ga. App. 423 (343 SE2d 111) (1986); *Hiers v. City of Barwick*, 262 Ga. 129, 134 (414 SE2d 647) (1992) (Hunt, J., concurring specially in part).

The Court of Appeals has considered a similar situation in *Jackson v. Miller*.[2] There, the plaintiff sued a doctor employed by the Columbus Medical Center for the wrongful death of her two-year-old son. The doctor defended on the ground of official immunity,[3] relying on this Court's decision in *Hennessy v. Webb*.[4] The Court of Appeals held that the doctor was not entitled to that defense since "his alleged negligence was simply that of a medical doctor in providing treatment to a patient. His primary duty in this instance being to his patients rather than to the state or the city."[5]

Moreover, in considering a case identical to this one in all material respects, the Supreme Court of Virginia said the following regarding the relationship between a doctor who was a faculty member at the Medical School of the University of Virginia and a private-pay patient that he treated at the University of Virginia Hospital:

> At the point when the physician agrees to treat or operate on a certain patient, although his employment by the University makes possible the arrangement, the relationship becomes the personal and confidential one of doctor and patient, not the Commonwealth of Virginia and patient. The physician owes his best professional efforts on behalf of the patient, and the patient expects, and has a right to expect, the same care and attention from the physician that he would receive if he were in a private hospital and the physician in private practice. The exercise by the attending physician of his professional skill and judgment in treating his patient, and the means and methods used, from the very nature of things, are not subject to the control and direction of others. The fact that the physician may follow certain prescribed guidelines and consult with colleagues, or that a review may be conducted when a patient is injured, or when a patient dies, does not alter the professional status of the attending physician or his relationship with and obligation to his patient.[6]

---

[2] 176 Ga. App. 220 (1) (335 SE2d 438) (1985).

[3] Although the Court of Appeals used the term sovereign and governmental immunity in its opinion, it is clear from the context that the court was actually applying the concept of official immunity.

[4] 245 Ga. 329 (264 SE2d 878) (1980).

[5] *Jackson*, 176 Ga. App. at 221. See also *Swofford v. Cooper*, 184 Ga. App. 50 (2) (360 SE2d 624) (1987), aff'd 258 Ga. 143 (368 SE2d 518) (1988). Although *Jackson* has fallen under some criticism, see Judge Beasley's dissent in *Swofford*, 184 Ga. App. at 55-56, and Judge Deen's special concurrence in *Roberts v. Grigsby*, 177 Ga. App. 377, 379-380 (339 SE2d 633) (1985), we find its reasoning persuasive under the circumstances of this case.

[6] *James v. Jane*, 282 SE2d 864, 867-868 (Va. 1980).

The Supreme Court of Virginia has characterized the role of the physicians in *James* as "independent contractors"[7] and "essentially private practitioners."[8]

Further, we addressed a similar issue regarding the relationship of physician and patient in *Davis v. Stover*.[9] In that case, the issue was whether, with regard to a medical malpractice action, a *company* physician was entitled to the statutory immunity granted to "employee[s] of the same employer"[10] under the workers' compensation laws. We held that the company physician was not entitled to statutory immunity. We reasoned that the company physician's

> professional standing . . . creates a trusting relationship that cannot be breached with impunity. "A professional person is liable for an abuse of the trust reposed in him by the public, provisions of the compensation act notwithstanding." [*Downey v. Bexley*, 253 Ga. 125, 126 (317 SE2d 523) (1984).]
>
> . . .
>
> [A] worker expects and trusts his treatment will be made by the doctor's independent professional judgment. Because of the relationship between physicians and patients, company physicians cannot use the Workers' Compensation laws as a shield to insulate themselves from individual liability for medical malpractice claims.[11]

For the reasons outlined above, we conclude that the nature of Dr. Plouffe's relationship with Ms. Keenan, as well as the fact that the allegations of negligence relate solely to Dr. Plouffe's independent medical judgment in treating Ms. Keenan, militate towards a ruling that Dr. Plouffe was not acting with the scope of his official state duties in treating Ms. Keenan.

3. Further, an examination of legislative intent bolsters the conclusion that the General Assembly did not intend for the language of § 50-21-25 to provide immunity to physicians under circumstances like those existing in this case. OCGA § 50-21-21 expresses the intent of the Tort Claims Act, and subsection (c) directs that the provisions of the Act "should be construed with a view to carry out this expression of intent." With regard to official immunity, § 50-21-21 (b) provides as follows:

> [T]he proper functioning of state government requires

[7] *Messina v. Burden*, 321 SE2d 657, 663 (Va. 1984).
[8] *Bowers v. Commonwealth*, 302 SE2d 511, 515 (Va. 1983).
[9] 258 Ga. 156 (366 SE2d 670) (1988).
[10] OCGA § 34-9-11 (a).
[11] *Davis*, 258 Ga. at 157.

that state officers and employees be free to act and to make decisions, in good faith, without fear of thereby exposing themselves to lawsuits and without fear of the loss of their personal assets. Consequently, it is declared to be the public policy of this state that state officers and employees shall not be subject to lawsuit or liability arising from the performance or nonperformance of their official duties or functions.

This Code section embodies the traditional justification for official immunity.[12] Protecting doctors against the exercise of their medical discretion (as opposed to the exercise of governmental discretion) in treating a private-pay patient does not further the purposes of official immunity. First, a doctor in this situation is under a duty to treat the patient with "a reasonable degree of care and skill,"[13] regardless of whether the doctor is protected by immunity.[14] Further, liability insurance is readily available for medical doctors who treat private-pay patients.[15] Thus, immunity is not necessary to encourage doctors to treat their patients or to protect their assets.[16] Because the purpose of official immunity is not furthered by construing the phrase "official duties" to encompass the exercise of medical discretion with regard to private-pay patients, we decline to construe that phrase to provide protection in this case.[17]

For all of the foregoing reasons, we hold that the trial court erred in granting summary judgment to Dr. Plouffe.

*Judgment reversed. All the Justices concur, except Benham, C. J., who dissents.*

---

[12] *Gilbert v. Richardson*, 264 Ga. 744, 750 (4) (452 SE2d 476) (1994) ("[T]he basis of the immunity has been not so much a desire to protect an erring officer as it has been a recognition of the need of preserving independence of action without deterrence or intimidation by the fear of personal liability and vexatious suits.").

[13] OCGA § 51-1-27.

[14] *Kassen v. Hatley*, 887 SW2d 4, 10-11 (Tex. 1994); *Henderson v. Bluemink*, 511 F2d 399, 402-403 (D. C. Cir. 1974); *Scarpaci v. Milwaukee County*, 292 NW2d 816, 827 (Wis. 1980); *Womble v. Singing River Hosp.*, 618 S2d 1252, 1263-1264 (Miss. 1993).

[15] *James*, 282 SE2d at 54. That is not to say, however, that if a doctor did not have insurance, a different result would obtain.

[16] *Kassen*, 887 SW2d at 11; *Womble*, 618 S2d at 1263-1264; *Henderson*, 511 F2d at 402-403.

[17] Because this case involves the exercise of a medical discretion on a private-pay patient that was not controlled by the government employer or by statute, we do not consider whether immunity is appropriate for state-employed physicians who are required to treat particular patients, or who are alleged to have violated governmental, as opposed to medical, responsibilities, or whose medical discretion is controlled or impacted by governmental standards or constraints.

BENHAM, Chief Justice, dissenting.

Being unable to agree with the tenets of the majority opinion, and having some grave concerns that the opinion contains fault lines that will cause the collapse of official immunity for all professionals in government service and will imperil official immunity for all government employees, both professional and non-professional, in spite of the clear legislative enactments to the contrary, I must respectfully dissent.

This case presents the issue of whether a medical doctor at the Medical College of Georgia enjoys official immunity under the constitution and statutes of this state when he exercises his medical judgment in the performance of a medical operation. The trial court held that Dr. Plouffe was clothed with official immunity when he performed the operation in question, but the majority opinion of this Court reverses the trial court, holding that the doctor should be stripped of that protection because he exercised his medical discretion and not his governmental discretion, and because to do otherwise would not be in keeping with the legislative intent.

My disagreement with the majority is on three broad fronts: (1) It fails to show how the denial of official immunity is in keeping with the legislative intent; (2) it fails to provide any clear test as to how professional discretion is distinguished from official discretion; and (3) it fails to show why partial or complete payment for services provided should be a bar to official immunity protection.

A brief review of the facts is necessary for a proper discussion of the issues involved. This case arose out of a suit filed by the husband of a woman who is in a permanent vegetative state allegedly due to the negligent performance of an operation by Dr. Plouffe while he was employed at the Medical College of Georgia as a professor. Before the medical procedure in question, the patient signed a form acknowledging that the procedure would be performed at a teaching hospital and that students and observers would be present for educational purposes. Prior to the operation, the doctor discussed the operation not only with the patient, but also with the students assigned by the medical college to assist and observe, because his responsibilities as a professor included classroom instruction, conferring with students and other faculty members, and the supervision of students and residents. He also had duties of research and service to patients. The trial court determined that Dr. Plouffe enjoys official immunity because, at the time of the operation in question, he was in the performance of his duties as a professor at the Medical College of Georgia.

1. Any analysis of the issue of official immunity must begin with an attempt to determine the legislative intent. A review of constitutional enactments and legislative provisions clearly shows that the

legislature intended to insulate state employees from liability and protect them from lawsuits in the performance of their official duties. That intent is set out in OCGA § 50-21-21 (b) which provides as follows:

> The General Assembly also recognizes that the proper functioning of state government requires that state officers and employees be free to act and to make decisions, in good faith, without fear of thereby exposing themselves to lawsuits and without fear of the loss of their personal assets. Consequently, it is declared to be the public policy of this state that state officers and employees shall not be subject to lawsuit or liability arising from the performance or nonperformance of their official duties or functions.

With this legislative intent uppermost in my mind, I have sought to analyze the majority's approach to this problem. The trial court determined that Dr. Plouffe was not acting as an independent contractor at the time of the operation, but was acting pursuant to his responsibilities as a professor at the Medical College of Georgia. The record shows and the trial court determined that Dr. Plouffe was a full-time professor at the medical college; that at the time of the operation, he was working in a teaching capacity; that at the time of the surgery, he was a "physician professor providing clinical care in conjunction with educational instruction . . . [and that he] participated in the subject surgery to teach a resident doctor and . . . he was fulfilling a teaching responsibility at the time." The record further shows that the medical school assigned patients to doctors for medical treatment, assigned student assistants and observers when operations were being performed, and set aside blocks of time for operations to be performed, all without the doctor taking part in the decisions.

2. We must determine whether Dr. Plouffe was acting in an official capacity when he performed the operation in question. The majority opinion at 793 states that "the decisive question in this case is whether Dr. Plouffe was acting within the scope of his official state duties. . . . If he was, then he is protected from suit by OCGA § 50-21-25. . . . [W]e conclude that he was not acting in the course of his official duties as a state employee in his treatment of Ms. Keenan."

The opinion goes on to say that Dr. Plouffe was not acting within the scope of his employment because "he had distinct obligations to Ms. Keenan that were independent of his official duties." But the majority opinion fails to say what those duties were. If they were duties imposed on him either ethically or professionally as a doctor, then those were the duties he was employed by the Medical College

of Georgia to perform. As a professional, he was hired to exercise his discretion as a doctor.

Noticeably absent from the majority opinion is any mention whatsoever of *Azizi v. Bd. of Regents*, 132 Ga. App. 384 (6) (208 SE2d 153) (1974), which was cited by the trial court in support of its determination of official immunity:

> The contention that the operation of a hospital in conjunction with the medical college is not a "governmental function" is without merit. Public education is a governmental function and the Medical College of Georgia is an essential unit of this function. A medical college without a hospital in conjunction therewith would be like a buggy without a horse, or in more modern parlance, an airport without aircraft.

The appellate courts of this State have reaffirmed Georgia's commitment to official immunity in several recent cases, e.g., *Miller v. Ga. Ports Auth.*, 266 Ga. 586 (470 SE2d 426) (1996); *Christensen v. State of Ga.*, 219 Ga. App. 10 (464 SE2d 14) (1995). Of particular importance is the language of *Christensen*, where the court states at 14,

> It [is] well established that "where an officer is invested with discretion and is empowered to exercise his judgment in matters brought before him, he is sometimes called a quasi-judicial officer, and when so acting he is usually given immunity from liability to persons who may be injured as the result of an erroneous decision; provided the acts complained of are done within the scope of the officer's authority, and without wilfulness, malice, or corruption." [Cit.]

Georgia is not alone in its desire to clothe government employees with official immunity. Other states have been equally enthusiastic in doing so. *Smith v. Arnold*, 564 S2d 873 (Ala. 1990); *Gargiulo v. Ohar*, 387 SE2d 787 (Va. 1990); *Canon v. Thumudo*, 422 NW2d 688 (Mich. 1988).

If the majority seeks to hold that Dr. Plouffe was acting outside the scope of his employment at the time he performed the operation in question, it fails to show how the trial court erred in determining otherwise.

I am even more troubled by the majority's statement that "the duties alleged to have been violated in this case relate strictly to the medical care provided to Ms. Keenan and do not call into play what might be termed 'governmental considerations,' such as the allocation of state resources for various types of medical care." The record

shows, however, that the provision of medical care is part and parcel of Dr. Plouffe's duties as a teacher at the Medical College of Georgia. The distinction between medical discretion and governmental discretion set forth in the majority opinion is a distinction without a difference. Furthermore, we are not given any guidance whatsoever as to how to determine whether a professional's actions are within or outside the scope of his employment. Leaving the law with no measuring tool is an invitation to haphazard application of the law. Such an approach creates uncertainty and unpredictability in.an area that is in need of guidance and direction.

This decision can have far-ranging consequences since it is not limited to the facts of this case. Under the majority's approach, if professionals in government employment exercise professional judgment, they will be stripped of official immunity, and the effect will not be limited to doctors with the Medical College of Georgia. This ruling will bring within its sweep all professionals in government, including lawyers, engineers, and accountants, just to name a few. It will bring to a halt all research projects conducted by state officials, all pilot projects, all experiments that are conducted by professionals in state government, because their actions will involve the exercise of professional judgment and discretion.

3. If the majority's holding is based to any degree on the fact that Dr. Plouffe received some payment through an association established through the Medical College of Georgia to provide care to patients for a fee, it should say so. However, if such a statement were made in the majority opinion, it would fly in the face of the record which shows that the Medical College of Georgia Physician Practice Group Foundation, through which Dr. Plouffe was allowed to treat patients, was governed by Articles of Association which provide that professional services would be rendered by the Group "in accordance with the patient care policies of the Medical College of Georgia," and that the funds for the operation of the Group would be disbursed for the benefit of the Medical College of Georgia. According to the Articles of Association, the purpose of the Physician's Practice Group is "to acquire and administer funds and property which, after payment of necessary expenses, shall be devoted exclusively to charitable, scientific, and educational purposes for the benefit of the Medical College of Georgia."

If pay, either partial or complete, is a determining factor in vitiating official immunity, then this case will have extremely dire consequences. The trend throughout the country is to provide for some type of payment by citizens who receive government supported services. This is true not only in the medical arena, but in many other arenas, from medical services to legal services to social services. If we strip government professionals of their official immunity simply

because they participate in programs where the recipients pay in whole or in part, we will sign the death warrant for such programs and an even greater burden will be imposed on government to provide services completely free even when recipients can pay some, if not all, of the expenses. Such a consequence surely was not contemplated by the legislature in enacting statutes providing for official immunity.

Official immunity has as its purpose the protection of public agents from personal liability and from unnecessary lawsuits arising from the performance of discretionary acts within the scope of their authority. See *Shuman v. Dyess*, 175 Ga. App. 213 (333 SE2d 379) (1985). That purpose can best be achieved by applying official immunity in this case because the facts are clear: Dr. Plouffe was performing medical procedures in his official capacity as a professor at the Medical College of Georgia; the procedure was performed at a government-affiliated facility; and it was performed pursuant to Dr. Plouffe's duties as a college professor. Even though he exercised his professional judgment and discretion, the operation was performed, in part, to teach students proper medical procedures, and was performed in accordance with medical school policy and procedure. If such conduct renders him liable, then official immunity is mortally wounded.

DECIDED MARCH 3, 1997 —
RECONSIDERATION DENIED APRIL 4, 1997.

*Mills & Moraitakis, Roger Mills, Nicholas C. Moraitakis, Glenn E. Kushel,* for appellants.

*Michael J. Bowers, Attorney General, Patricia Guilday, Assistant Attorney General, Dye, Tucker, Everitt, Wheale & Long, Duncan D. Wheale, Hull, Towill, Norman & Barrett, Patrick J. Rice,* for appellees.

*Franklin, Taulbee, Rushing, Bunce & Brogdon, Rowe Brogdon, Jr., Cook, Noell, Tolley & Aldridge, J. Vince Cook, Alston & Bird, G. Conley Ingram, Elizabeth Bertschi,* amici curiae.