A01A1328. BOARD OF PUBLIC SAFETY v. JORDAN.
(556 SE2d 837)

BLACKBURN, Chief Judge.

Under the auspices of OCGA § 47-2-2, the Georgia Board of Public Safety ("Board") terminated Bennett A. Jordan's employment as Superintendent of the Georgia Police Academy. Following his discharge, Jordan sued the Board and other defendants, asserting mul-

---

[11] See id. at 336-340.

tiple claims and amending his initial complaint five times.[1] Ultimately, the sole issue remaining for trial was Jordan's claim for intentional infliction of emotional distress. The jury found against the Board and awarded Jordan $1.8 million in compensatory damages and $360,000 in attorney fees which was reduced to the statutory limit of $1 million.

In this appeal, the Board contends that (1) sovereign immunity bars Jordan's claim, (2) Jordan should have been collaterally estopped from injecting evidence of a Board "pretext" for termination at trial, (3) the facts presented failed to support Jordan's claim, and that the trial court erred by (4) allowing the admission of character evidence, (5) failing to bifurcate the trial, (6) restricting the Board from tendering the hearing officer's recommendation to terminate Jordan to the jury, (7) failing to admit testimony from Board members, and (8) refusing to give three specific charges to the jury. After review, we reverse.

As a merit system employee in a classified position, Jordan could be terminated only upon a "for cause" finding pursuant to OCGA § 47-2-2. Subsection (d) of the Employees' Retirement System of Georgia ("ERS") Code lists the following grounds for termination for cause:

> An employee may be discharged from employment pursuant to the requirements of this Code section for insubordination, irresponsible performance of duties, malingering, neglect of duty, or unsatisfactory performance of duties in a willful manner or for any combination of such reasons. Any employee so discharged from employment shall not be entitled to and shall not receive a retirement benefit based on involuntary separation from employment without prejudice pursuant to Code Section 47-2-123.

OCGA § 47-2-2 (d). The ERS Code specifically defines each ground, including the two pertinent here: "[i]rresponsible performance of duties" and "neglect of dut[ies]." OCGA § 47-2-2 (c) (5), (7). When discharge is under consideration, the State employer must transmit a written notice to the employee in the format specified by subsection (g). See OCGA § 47-2-2 (g). An employee's service may end by "involuntary separation from employment without prejudice," or "involun-

---

[1] Jordan also asserted claims under 42 USC § 1983, the Age Discrimination in Employment Act, 42 USC § 1988, as well as tortious interference with business opportunity, conspiracy to commit tortious and illegal conduct, and violation of his substantive due process rights based upon an alleged liberty interest in his reputation. These other claims were summarily adjudicated or dismissed and are not at issue in this appeal.

tary separation from employment with prejudice." OCGA § 47-2-2 (a).

In early October 1991, the Board sent two state troopers to Jordan's house to serve Jordan with formal notice of the proposed termination and the right to a hearing. In the letter, the Board formally apprised Jordan of eight charges, most of which pertained to Jordan's failure to reduce expenditures during a state-wide budgetary crisis and his failure to disclose certain information to the Board. The Board subsequently sent two amended notices to Jordan. More than two months after the initial notice, on December 11, 1991, presiding officer Melvin M. Goldstein conducted an administrative hearing on the eight charges pending against Jordan. At the hearing, the State sought to prove that Jordan "had been fiscally irresponsible" and "deceptive" in providing or failing to provide certain information to members of the Board. In his opening statement, Jordan's counsel disputed the validity of the charges and argued, "This is a case that has an underlying motive that's going to have to be explored in this matter and has really two levels of motive." Jordan's attorney claimed that the Board was "attempting to terminate Mr. Jordan as part of a reorganization of the Georgia Police Academy, the Georgia Fire Academy and the Georgia Public Safety Training Center." He argued that the Board did not want to give him his rights and privileges as a merit system employee and that the Board wanted to prevent him from obtaining involuntary separation benefits and submitting his case to the Merit System Board.

The Board offered evidence showing that despite an ongoing severe budget crisis, Jordan went on trips to Unicoi State Park and Jekyll Island costing $5,000 and over $17,000 respectively. Vice Chairman of the Board, Robert E. Wilson, testified that the Board had oversight responsibility for the Department of Public Safety, the Georgia Bureau of Investigation, the Police Academy, the Fire Academy, and the Georgia Public Safety Training Center. According to Wilson, while there was a proposed plan to create a "supercop" to oversee all these agencies, Jordan's position would not be eliminated, but the hierarchy would change and he would have reported to an intermediary and not directly to the Board. Under the reorganization plan, Wilson explained that the Police Academy would form an operational division of the Public Safety Training Center. Wilson described political in-fighting as a continuing problem between the Police Academy and the other agencies. Wilson also detailed instances in which he felt that Jordan had not been completely forthright with members of the Board. Wilson testified that it was his conclusion that Jordan's Jekyll Island trip was "a boondoggle," "a defiant act toward the Governor," and "an attempt by Mr. Jordan to have a nice outing, one in the mountains for in the fall, and one at the beach in the summer for chiefs and sheriffs that he could get to attend to

keep his political wheels greased." According to Wilson, Jordan admitted having used bad judgment. Wilson testified that Jordan refused to retire and "insisted that we fire him" because "he wanted involuntary separation" benefits. The administrative hearing consumed three days.

The hearing officer, Goldstein, submitted a lengthy decision to the Board in which he recommended Jordan's termination for cause. In a 25-page decision, that included comprehensive factual findings as well as legal conclusions, the hearing officer found that: Jordan had misled the Board with respect to the use of certain computer equipment; Jordan's participation in unnecessary seminars was fiscally irresponsible; Jordan had been untruthful regarding the cancellation of one seminar; Jordan's decision to proceed with a staff retreat was fiscally irresponsible; and Jordan had been untruthful about his awareness of the general budget crisis in state government. The hearing officer recommended Jordan's employment be terminated pursuant to OCGA § 47-2-2 (c) (5) (D) for "irresponsible performance of duties" and under OCGA § 47-2-2 (c) (7) for "neglect of duty." The Board adopted the hearing officer's recommendation, and Jordan's employment ceased effective February 5, 1992.

For reasons not made clear by the record, Jordan did not avail himself of his right to judicial review of the Board's decision as provided in OCGA § 47-2-3. Acting without a jury, a superior court is empowered to reverse or modify the decision of the employer,

> if substantial rights of the employee have been prejudiced because the administrative findings, inferences, conclusions, or decision of the employer were: (1) In violation of constitutional or statutory provisions; (2) In excess of statutory authority of the employer; (3) Affected by other error of law; (4) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or (5) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

OCGA § 47-2-3 (f). Although judicial review is normally confined to the record, "[i]n cases of alleged irregularities in procedure before the employer, not shown in the record, proof thereon may be taken in the court," and the superior court, "upon request, shall hear oral argument and receive written briefs." OCGA § 47-2-3 (e).

Instead of exercising his statutory right to appeal the Board's decision, Jordan waited nearly two years after his discharge to file a multi-count lawsuit which included a claim for intentional infliction of emotional distress. The gravamen of Jordan's suit was that his rights were abrogated and his reputation sullied when he was wrong-

fully discharged and that he suffered great emotional harm as a consequence. In a claim for intentional infliction of emotional distress, Jordan specifically alleged that "[the] reprimands, suspensions and ultimate termination of Plaintiff's employment as the Superintendent of the Georgia Police Academy have caused Plaintiff to suffer and to continue to suffer severe emotional anguish, humiliation, distress and embarrassment." The Board moved to dismiss Jordan's case, in part relying upon the doctrine of sovereign immunity. The trial court denied the motion, and the case proceeded to trial.

Eventually the legal issues were narrowed and confined to the parameters of a consolidated pre-trial order. The gist of Jordan's case as outlined in the PTO was that the Board desired to reorganize and restructure certain public safety organizations and wanted to eliminate certain positions including his superintendent position. According to Jordan's theory of the case:

> [t]he "Super Chief" bill, as it was referred to, would have consolidated all state law enforcement training agencies under one umbrella agency with one agency director. The proposed legislative reorganization plan would have eliminated the Superintendent positions for both the Police Academy and the Fire Academy. The "Super Chief" bill failed to pass the legislature.

According to Jordan's theory of his case, he was removed from his job and became a "target" because he presented an obstacle to the reorganization plan. By his theory,

> [t]he evidence in this case shows that when the "Super Chief" bill failed to pass the legislature, Defendant — knowing elimination of Jordan was essential — began the malicious process of terminating Jordan. Defendant asserted pretextual allegations not of a kind or nature normally relevant to O.C.G.A. § 47-2-2. Ultimately, Jordan was terminated pursuant to O.C.G.A. § 47-2-2 with prejudice based upon Defendant's pretextual allegations.

By his theory, the Board

> in its zeal to accomplish its objective[ ] engaged in conduct that exceeded the bounds of decency and committed acts that are intolerable in a civilized community, causing Jordan to experience severe emotional anguish, humiliation, distress and embarrassment. Defendant's conduct was willful, intentional and carried out with utter disregard of Jordan's rights and the laws governing their conduct.

582

At trial, Jordan presented evidence to show that the Board "set in motion the malicious process of fabricating 'cause' to justify his termination" in order to facilitate a reorganization plan, thereby causing him to suffer emotional distress. As part of the "malicious process," Jordan testified that a television news reporter had been tipped off about a seminar that he attended at Unicoi State Park during the budget crisis. Jordan testified that the reporter told him that Board Vice Chairman Wilson was quite upset that he attended the seminar, and the reporter aired a segment on television indicating that Jordan had misused state funds. Jordan testified that he had been "set up" so he could be discredited.

Jordan testified that at an October 1, 1991 meeting with Wilson, then the Vice Chairman of the Board, Wilson mentioned that the Board was "talking about terminating" him. According to Jordan, Wilson warned that the Board could "make it hard or easy" and that he should voluntarily resign. Jordan testified that when he refused to resign, Wilson threatened that he would "write [Jordan's] termination in a way to protect the Governor. . . . This will become a permanent record. We will dig things up if necessary. . . . We must make it legal with [the] reorganization plan." At a Board meeting, Wilson stated words to the effect that it would strengthen the Board's position legally, "if everybody bellied up to the bar, signed the [termination] letter, and that we would hang alone or hang together, but there is less chance of hanging if we all join in." After his discharge became final, Jordan testified that he learned that his record contained notice that he had been permanently disqualified from future merit system employment, although according to Jordan, no statutory authority for such action existed.[2]

Jordan offered testimony to show that an employee's complete employment history was usually a "material" consideration when determining disciplinary actions. Jordan testified that he had not received any prior notification of any job performance deficiency from the Board and that he was never provided an opportunity to correct any claimed deficiency. One witness testified that the statute upon which Jordan was terminated was usually reserved for "alcoholics, criminals, malingerers, those who use state property for personal use or gain and excessive absenteeism," and that the statute had been used on fewer than five occasions in eight years. Moreover, other employees who committed the same acts upon which Jordan was terminated were not similarly disciplined. Jordan testified that because

---

[2] A letter from the Commissioner of the State Merit System indicates that Jordan was disqualified only from reemployment by the Department of Public Safety. The letter states, "NOT ELIGIBLE FOR REHIRE IN TERMINATING DEPARTMENT." Jordan testified that the disqualifying language was later removed.

he had been terminated under OCGA § 47-2-2, instead of under the merit system provisions, he was denied involuntary separation retirement benefits. Jordan testified that his termination was widely publicized in the news media. The jury entered a verdict for Jordan in the amount of $1.8 million in compensatory damages for intentional infliction of emotional distress and $360,000 in attorney fees, which was reduced to the statutory maximum of $1 million.

1. We review the trial court's denial of the Board's motion to dismiss on sovereign immunity grounds de novo. See *Cobb County v. Jones Group, P.L.C.*[3]

"Under the Georgia Constitution, sovereign immunity extends to the state and all of its departments and agencies. This immunity may be waived only by a legislative act which specifically provides that sovereign immunity is thereby waived and the extent of such waiver." (Punctuation and footnotes omitted.) *Dept. of Veterans Svcs. v. Robinson.*[4] The Georgia Tort Claims Act, OCGA § 50-21-20 et seq., provides a limited waiver of sovereign immunity for torts committed by State employees acting within the scope of their employment. *Rhoden v. Dept. of Public Safety;*[5] *McLemore v. City Council of Augusta.*[6] But there are exceptions to the limited waiver. Under OCGA § 50-21-24, the State remains immune for "losses" resulting from performance of a discretionary function or from slander and libel.

To determine whether these exceptions protect the Board's sovereign immunity, we focus upon the conduct which actually produced Jordan's "losses," his severe emotional distress and loss of reputation. See *Youngblood v. Gwinnett Rockdale &c. Svc. Bd.;*[7] *Ga. Military College v. Santamorena;*[8] *Dept. of Human Resources v. Hutchinson.*[9] If the Board's conduct that caused Jordan's emotional distress was based on its policy judgment or if the Board's acts were slanderous or libelous, then the Board was protected by immunity. See OCGA § 50-21-22 (2).

We find that the conduct at issue either involved slander, libel, or discretionary acts of the Board. Under OCGA § 51-5-4 (a) (3), a party slanders or orally defames by "[m]aking charges against another in reference to his trade, office, or profession, calculated to injure him therein." OCGA § 51-5-1 (a) defines libel as "a false and

---

[3] *Cobb County v. Jones Group, P.L.C.*, 218 Ga. App. 149, 153 (460 SE2d 516) (1995).

[4] *Dept. of Veterans Svcs. v. Robinson*, 244 Ga. App. 878, 879 (536 SE2d 617) (2000).

[5] *Rhoden v. Dept. of Public Safety*, 221 Ga. App. 844, 845 (1) (473 SE2d 537) (1996).

[6] *McLemore v. City Council of Augusta*, 212 Ga. App. 862, 864 (2) (443 SE2d 505) (1994).

[7] *Youngblood v. Gwinnett Rockdale &c. Svc. Bd.*, 273 Ga. 715, 717 (3) (545 SE2d 875) (2001).

[8] *Ga. Military College v. Santamorena*, 237 Ga. App. 58, 60 (1) (514 SE2d 82) (1999).

[9] *Dept. of Human Resources v. Hutchinson*, 217 Ga. App. 70, 71-72 (1) (456 SE2d 642) (1995).

malicious defamation of another, expressed in print, writing, pictures, or signs, tending to injure the reputation of the person and exposing him to public hatred, contempt, or ridicule." Jordan's allegations concerning the Board's purported statements to the media that Jordan was engaged in extravagant seminars and was misusing funds constitute slander as defined under the statute. Even assuming arguendo that Jordan's employment record contained a malicious and false notation permanently disqualifying him from future merit system employment, and further assuming arguendo that such writing constituted libel, no liability attached.[10] See OCGA § 50-21-24 (7).

We find that the remaining Board actions were within the ambit of the Board's discretion inherent to the exercise of its administrative functions. See OCGA § 50-21-24 (5). OCGA § 50-21-24 (2) allows the government to retain its immunity for discretionary acts, *whether or not that discretion is abused.* See *Brantley v. Dept. of Human Resources.*[11] Discretionary acts involve "a function or duty requiring a state officer or employee to exercise his or her policy judgment in choosing among alternate courses of action based upon a consideration of social, political, or economic factors." OCGA § 50-21-22 (2). The exception prevents "judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." (Punctuation omitted.) *Brantley*, supra at 682-683. "A discretionary act . . . calls for the exercise of personal deliberation and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed." *Schulze v. DeKalb County.*[12]

Apparently recognizing the preclusive effect of the factual findings entered by the hearing officer and ratified by the Board, Jordan claims that he is not contesting his discharge but the manner in which it occurred. As stated in the response to the Board's reply brief, "Jordan's claim does not challenge an employment decision by the Board; the discretionary decision-making process is not the issue in Jordan's case. Rather Jordan's claim rests upon the Board's conduct in carrying out that termination." Somewhat incongruously, Jordan asserts that he did not base his intentional infliction of emotional distress claim upon the *decision* to terminate him but that the *manner in which the Board effected* his termination caused his distress.

Here, there can be no doubt that the Board's actions in effectuating Jordan's termination were grounded in social, economic, or politi-

---

[10] Jordan also claims that he should have been able to argue at trial that the Board made "false" statements concerning his job performance and that such conduct caused him distress.

[11] *Brantley v. Dept. of Human Resources*, 271 Ga. 679, 680 (523 SE2d 571) (1999).

[12] *Schulze v. DeKalb County*, 230 Ga. App. 305, 308 (2) (496 SE2d 273) (1998).

cal goals or a combination thereof.[13] The *manner in which the Board effected* Jordan's termination was wholly a matter of choice by the Board. Jordan offered no evidence showing that the Board's decision did not fully comply with the provisions of OCGA § 47-2-2. Nor has he pointed to any specific rule or regulation directing the Board to follow any particular procedure in *effecting* the minor details of his termination. Even assuming arguendo that the Board was attempting to follow what it perceived were the Governor's guidelines for reorganizing the public safety agencies, no specific instructions were provided to the Board regarding how to *effect* the reorganization, i.e., utilizing "for cause" provisions of OCGA § 47-2-2, serving notice and retrieving his automobile from his house at 9:00 p.m., trying to get the support of the entire Board so they could "all hang" together, failing to similarly discipline others that committed the same acts as Jordan, and failing to give Jordan the chance to cure his alleged deficiencies. Thus, the Board's actions were discretionary in nature and protected, even if the Board could be said to have abused its discretion. OCGA § 50-21-24 (2). See *Brantley,* supra; *Rowe v. State Bd. of Pardons & Parole.*[14]

In so holding, we note that

[n]othing we have said goes to the wisdom of refusing to waive sovereign immunity in circumstances such as those in this case. Sovereign immunity is a harsh doctrine, not an equitable one. Indeed, it is just the opposite of equity — it is the state declaring that it cannot be sued even where it would otherwise be liable. . . . Our job is to read the statute, not to rewrite it to conform to an equitable result.

*Dept. of Human Resources v. Coley*[15] (physical precedent only).

2. The Board contends that the trial court erred by failing to direct a verdict on Jordan's claim for intentional infliction of emotional distress. The Board argues that since it acted within its rights

---

[13] Federal courts interpreting the very similar Federal Tort Claims Act have found that employment decisions, in particular, involve discretionary acts, since they "require consideration of numerous factors, including budgetary constraints, public perception, economic conditions, individual backgrounds, office diversity, experience and employer intuition." (Punctuation omitted.) *Beebe v. Wash. Metro. Area Transit Auth.,* 129 F3d 1283, 1287 (III) (D.C. Cir. 1997); see also *Richman v. Straley,* 48 F3d 1139, 1146-1147 (III) (10th Cir. 1995) ("Decisions regarding employment and termination are inherently discretionary, especially where, as here, the relevant statutes provide no guidance or restrictions. [Cit.] Such sensitive decisions are precisely the types of administrative action the discretionary function exception seeks to shield from judicial second-guessing.").

[14] *Rowe v. State Bd. of Pardons & Parole,* 240 Ga. App. 163, 164 (523 SE2d 40) (1999) (supervision of employee requires exercise of discretion).

[15] *Dept. of Human Resources v. Coley,* 247 Ga. App. 392, 398-399 (3) (544 SE2d 165) (2000).

to terminate the employment for cause, then, as a matter of law, Jordan's allegation that his termination was pretextual is insufficient to support a claim for intentional infliction of emotional distress.

To establish a claim for intentional infliction of emotional distress requires evidence of four essential elements: (1) the conduct must be intentional or reckless; (2) the conduct must be extreme and outrageous; (3) the existence of a causal connection between the wrongful conduct and the emotional distress; and (4) the emotional distress must be severe. *Jarrard v. United Parcel Svc.*[16] "Liability for intentional infliction of emotional distress has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." (Punctuation omitted.) *Biven Software v. Newman.*[17]

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by malice, or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been extreme and outrageous.

(Punctuation omitted.) *Jarrard*, supra at 61. The issue of whether the conduct at issue rises to the requisite level of outrageousness is a question of law for the trial court. *Johnson v. Savannah College of Art &c.*[18] When the acts of an employer, even when proven, are not sufficiently outrageous and egregious to constitute intentional infliction of emotional distress, the employer is entitled to judgment as a matter of law. See *Fox v. Ravinia Club.*[19] For this reason, even if Jordan's claim for intentional infliction of emotional distress had not otherwise been foreclosed by the doctrine of sovereign immunity, reversal would be warranted on this basis. See *Odem v. Pace Academy.*[20]

3. In light of the above, we need not address the Board's remaining enumerations of error, including its collateral estoppel argument. See *Swain v. State.*[21] We note that while Jordan claims that the administrative hearing was inherently "unfair" and that he did not have an opportunity to argue "pretext," the transcript of that hearing and a contrary finding by the trial court belie those assertions.

---

[16] *Jarrard v. United Parcel Svc.*, 242 Ga. App. 58, 59 (529 SE2d 144) (2000).
[17] *Biven Software v. Newman*, 222 Ga. App. 112, 113-114 (1) (473 SE2d 527) (1996).
[18] *Johnson v. Savannah College of Art &c.*, 218 Ga. App. 66, 67 (460 SE2d 308) (1995).
[19] *Fox v. Ravinia Club*, 202 Ga. App. 260, 262 (414 SE2d 243) (1991).
[20] *Odem v. Pace Academy*, 235 Ga. App. 648, 655 (510 SE2d 326) (1998).
[21] *Swain v. State*, 251 Ga. App. 110 (552 SE2d 880) (2001).

The trial court explicitly decided that the findings of fact made by the hearing officer and adopted by the Board were "binding and conclusive because there was a full and fair opportunity to litigate those matters." The trial court continued, "Having said that, I consider those findings of fact to be the equivalent of what would be an evidentiary stipulation." Moreover, the transcript of the administrative hearing is replete with testimony as well as argument about the impact of the Williams Commission Report that studied governmental effectiveness and economy and the prospect of pending reorganizing and restructuring the public safety agencies. In any event, it is undisputed that Jordan failed to avail himself of the opportunity under OCGA § 47-2-3 for independent judicial review of the Board's decision to discharge him from the position of Superintendent of the Police Academy. Nor did Jordan appeal the findings of fact adopted by the Board that his discharge was for cause.

*Judgment reversed. Pope, P. J., and Mikell, J., concur.*

DECIDED NOVEMBER 27, 2001 — ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

*Thurbert E. Baker, Attorney General, Kathleen M. Pacious, Deputy Attorney General, John C. Jones, Senior Assistant Attorney General, Gray, Hedrick & Edenfield, Bruce M. Edenfield, Evan R. Mermelstein,* for appellant.

*Weinstock & Scavo, Michael Weinstock, Richard J. Capriola, Jet Harris,* for appellee.